Jack Silver, Esq. SB #160575
LAW OFFICE OF JACK SILVER
708 Gravenstein Hwy. No. # 407
Sebastopol, CA 95472
Tel. (707) 528-8175
Email: JsilverEnvironmental@gmail.com

David J. Weinsoff, Esq. SB #141372
LAW OFFICE OF DAVID J. WEINSOFF
138 Ridgeway Avenue
Fairfax, CA 94930
Tel. (415) 460-9760
Email: david@weinsofflaw.com

Attorneys for Plaintiff
CALIFORNIA RIVER WATCH

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA RIVER WATCH, an IRC § 501(c)(3) non-profit, public benefit corporation,<br><br>Plaintiff,<br><br>v.<br><br>JAXON KEYS WINERY & DISTILLERY (A MEMBER OF WILSON ARTISAN WINERIES), KENNETH C. WILSON, and DIANE WILSON, also known as DIANE NOLAN,<br><br>Defendants. | Case No.: 3:20-cv-00197<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL PENALTIES, AND DECLARATORY RELIEF**<br><br>(Environmental - Clean Water Act 33 U.S.C. §§ 1251 *et seq*.) |

Plaintiff CALIFORNIA RIVER WATCH ("RIVER WATCH") hereby brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*.

**I.    INTRODUCTION**

1.    This action is a citizen suit for injunctive relief, civil penalties, and remediation brought against defendants Jaxon Keys Winery & Distillery (a Member of Wilson Artisan Wineries), Kenneth C. Wilson, and Diane Wilson also known as Diane Nolan (collectively hereafter, "Defendants"), for: (a) improperly certifying and obtaining a "No Exposure Certification ("NEC") from the North Coast Regional Water Quality Control Board ("RWQCB"); and/or (b)

submitting a Notice of Intent ("NOI") to the RWQCB for application of coverage under, but failing in both cases to comply with, the applicable terms detailed in National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Order No. 2014-0057-DWQ, (the "General Permit") a violation of CWA § 301(a) pursuant to CWA§ 505(a)(1)(B).

2. On or about August 27, 2019, RIVER WATCH provided its initial Notice, and on or about October 14, 2019 RIVER WATCH provided its Supplemental Notice of Defendants' violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board, and (4) Defendants, as required by the CWA, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of RIVER WATCH's 60-Day Notices of Violations ("NOTICES") are attached as **EXHIBIT A** and incorporated by reference. Defendants, the State Water Resources Control Board, the Regional and National Administrators of EPA all received this Notice.

3. More than sixty (60) days have passed since RIVER WATCH's NOTICES were served on Defendants, the State Water Resources Control Board, and the Regional and National EPA Administrators. RIVER WATCH is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this Complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under CWA § 309(g), 33 U.S.C. § 1319(g).

## II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), and 33 U.S.C.§ 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-2202 (declaratory relief), 33 U.S.C. § 1365(a) (injunctive relief), and 33 U.S.C. § 1319(d) (civil penalties).

5. Venue is proper because Defendants and their discharging facility reside/are located, and the events or omissions giving rise to RIVER WATCH's claims occurred, in this District. 28 U.S.C. § 1391(b)(1),(2). Venue is also proper because Defendants' CWA violations as alleged

in this Complaint have occurred and are occurring within the District.  33 U.S.C. § 1365(c)(1).

### III.   PARTIES TO THE ACTION

6.     RIVER WATCH, is now, and at all times relevant to this Complaint was, an Internal Revenue Code § 501(c)(3) non-profit, public benefit corporation organized under the laws of the State of California with headquarters located in Sebastopol, California and a mailing address of 290 South Main Street, #817, Sebastopol, California.  The specific purpose of RIVER WATCH is to protect, enhance, and help restore surface waters and groundwaters of California including rivers, creeks, streams, wetlands, vernal pools, aquifers and associated environs, biota, flora and fauna, and to educate the public concerning environmental issues associated with these environs.  Members of RIVER WATCH have interests in the waters and watersheds which are or may be adversely affected by Defendants' violations of the CWA as alleged in this Complaint.  Said members may use the effected waters and watershed areas for recreation, sports, fishing, swimming, hiking, photography, nature walks and/or the like.  Furthermore, the relief requested will redress the injury in fact, likelihood of future injury, and interference with the interests of said members.  Defendants' ongoing violations of the General Permit and the CWA will cause irreparable harm to members of RIVER WATCH for which they have no plain, speedy, or adequate remedy.

7.     RIVER WATCH is informed and believes, and on such information and belief alleges, that Defendant JAXON KEYS WINERY & DISTILLERY (A MEMBER OF WILSON ARTISAN WINERIES), is now, and at all times relevant to this Complaint was, a winemaking business identified under Standard Industrial Classification ("SIC") Code 2084 ("Wines, Brandy, and Brandy Spirits") located at 10400 South Highway 101, Hopland, Mendocino County, California (the "Facility").

8.     RIVER WATCH is informed and believes, and on such information and belief alleges, that Defendants KENNETH C. WILSON and DIANE WILSON, also known as DIANE NOLAN, are now, and at all times relevant to this Complaint were, the assessed owners of the real property located at 10400 South Highway 101, Hopland, Mendocino County, California, and the owners and operators of the Facility.

### IV. CLEAN WATER ACT

9. Congress declared that the CWA was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a). In furtherance of these goals, the CWA prohibits all discharges except those in compliance with an NPDES permit. 33 U.S.C. §§ 1311, 1342. The EPA promulgates regulations to implement the NPDES permitting system at 40 C.F.R. parts 122-129.

10. Pursuant to the requirements of the CWA, the State Water Resources Control Board developed a General Permit for Storm Water Discharges Associated With Industrial Activity ("General Permit") within the State of California. 33 U.S.C. § 1342; 40 C.F.R. § 122.26; NPDES General Permit No. CAS000001, State Water Resources Control Board Order No. 92-12-DWQ, amended by Order No. 97-03-DWQ and Order No. 2014-0057-DWQ. All facility operators subject to permitting must apply to their Regional Board for exemption from coverage under the General Permit, or coverage under the General Permit or another NPDES permit. *Id.*; Failure to do so, and failure to comply strictly with all permit requirements, violates the CWA. *Id.*; *see also* General Permit § XXI.Q.

11. The General Permit requires that the discharger (1) prepare, "certify and submit" an Annual Report on the year's discharge activities including compliance with the CWA and Genera Permit (General Permit § XVI), (2) perform visual observations and conduct sampling and analysis to monitor any discharges (General Permit § XI), and (3) prepare a comprehensive, site-specific Storm Water Pollution Prevention Plan ("SWPPP") (General Permit § X), among other requirements. Where a facility operator fails to "comply with all standard conditions [of the] General Permit," it shall "constitute[ ] a violation of the [CWA] and the Water Code and is grounds for enforcement action and/or removal from General Permit coverage." General Permit § XXI.A; 33 U.S.C. § 1342.

12. Under the CWA, dischargers are required, by July 1 of each year, to submit an Annual Report, based on laboratory reports, summarizing the year's monitoring and sampling, and

addressing any deficiencies in those required actions. General Permit § XVI.  Failure to submit an adequate Annual Report violates the General Permit and subsequently the CWA. General Permit § XXI.A; 33 U.S.C. § 1342.

13.     Pursuant to section XI.B of the General Permit, dischargers are required to monitor all discharges to ensure compliance with the provisions and purpose of the CWA. The current General Permit similarly requires extensive monitoring of discharges, including visual observations, sampling, and analysis. General Permit § XI.  The General Permit mandates that dischargers "collect and analyze storm water samples from two (2) Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31) and two (2) QSEs within the second half of each reporting year (January 1 to June 30)" "from each drainage area at all discharge locations." General Permit § XI.B.2 (first quote), XI.B.4 (second quote). Dischargers are then required to "submit all sampling and analytical results for all [samples] via [the Storm Water Multiple Application and Report Tracking System ("SMARTS")] within 30 days of obtaining all results for each sampling event."  General Permit § XI.B.11.a.  Failure to comply with these General Permit provisions violates the CWA. General Permit § XXI.A. ("Permit noncompliance constitutes a violation of the [CWA] and the Water Code and is grounds for enforcement action" or NPDES coverage termination); 33 U.S.C. § 1342.

14.     The General Permit also requires dischargers to "develop and implement a site-specific SWPPP for each industrial facility covered by [the] General Permit."  General Permit §§ I.I.54, X.A. The SWPPP must contain (1) the facility name and contact information, (2) a site map, (3) a list of industrial materials, (4) descriptions of potential pollution sources, (5) an assessment of those sources, (6) minimum Best Management Practices ("BMPs"), (7) advanced BMPs, if necessary, (8) a monitoring implementation plan, (9) an annual evaluation, and (10) dates when the SWPPP was prepared and amended.  General Permit § X.A.   All of this information must be submitted via SMARTS "within 30 days" of any significant revisions to the SWPPP, or every 3 months where there are only minor revisions. General Permit §§ X.B.2., X.B.3.

     a.     Among the many requirements for a SWPPP, a discharger "shall prepare a site map" that includes "[t]he facility boundary, storm water drainage areas within the

facility boundary," storm water collection and conveyance systems, associated discharge locations," "[l]ocations and descriptions of structural control measures," "[i]dentification of all impervious areas," locations of exposed materials, and "[a]reas of industrial activity subject to this General Permit." General Permit § X.E.3.; General Permit Attachment D § F.2 (listing requirements for site map). Failure to prepare an adequate site map renders the SWPPP deficient. General Permit § X.E.

b. All dischargers are required to describe and assess each potential pollutant source in their SWPPP. General Permit § X.G. "The discharger shall ensure the SWPPP describes each industrial process," "each material handling and storage area," "all industrial activities that generate a significant amount of dust or particulate that may be deposited within the facility boundaries," a "list of any industrial materials that have spilled or leaked," all non-storm water discharges, and "the facility locations where soil erosion may" occur. General Permit § X.G.1. The discharger shall also "ensure that the SWPPP includes a narrative assessment of all areas of industrial activity with potential pollutant sources." General Permit § X.G.2.a. The discharger's assessment of these sources must include, among other things, the location, type, quantity and physical characteristics of the pollutant, the potential for all exposure, all sampling and inspection records, and the potential effectiveness of the current BMPs to reduce or prevent pollutants in storm water discharges. General Permit § X.G.2.a.

c. The SWPPP must also "implement and maintain" the minimum BMPs described in the general permit (General Permit § X.H.1) and any advanced BMPs "necessary to reduce or prevent discharges of pollutants" (General Permit § X.H.2). The discharger shall "identify and describe" the implemented BMPs on which it relies to reduce discharges. General Permit § X.C.1.b. These BMPs descriptions shall include:

   i. The pollutant(s) the BMPs are designed to reduce or prevent...;

      ii.    The frequency, time(s) of day, or conditions where the BMPs are scheduled for implementation;

      iii.   The locations within each area of industrial activity or industrial pollutant source where the BMPs shall be implemented;

      iv.   The individual and/or position responsible for implementing the BMPs;

      v.    The procedures... and/or instructions to implement the BMPs effectively;

      vi.   The equipment and tools necessary to implement the BMPs effectively; and,

      vii.  The BMPs that may require more frequent visual observations beyond the monthly visual observations as described in XI.A.1. General Permit § X.H.4.a. The minimum BMPs that are required in the SWPPP include Good Housekeeping (General Permit § X.H.1.a), Preventative Maintenance (General Permit § X.H.1.b), Spill and Leak Prevention and Response (General Permit § X.H.1.c), Material Handling and Waste Management (General Permit § X.H.1.d), Erosion and Sediment Controls (General Permit § X.H.1.e), Employee Training Programs (General Permit § X.H.1.f), and Quality Assurance and Record Keeping (General Permit § X.H.1.g). The advanced BMPs that may be implemented as necessary include Exposure Minimization (General Permit § X.H.2.b.i), Storm Water Containment and Discharge Reduction (General Permit § X.H.2.b.ii), Treatment Control (General Permit § X.H.2.b.iii), or other BMPs "necessary to meet effluent limitations of this General Permit" (General Permit § X.H.2.b.iv). All dischargers must identify and describe the BMPs implemented. (General Permit §§ X.C.1.b, X.H.1, X.H.2, X.H.4.a. Failure to do

Complaint for Injunctive Relief, Civil Penalties, And Declaratory Relief

                so invalidates the SWPPP and violates the CWA. General Permit §§ X.C.1.b, X.H, XXI.A; 33 U.S.C. § 1342.

    d.    Furthermore, the SWPPP must be signed and certified as "true, accurate, and complete" and therefore cannot contain internal contradictions. General Permit §§ I.I.54, II.A, XXI.L; General Permit Appendix 1. Internal inconsistencies would render the SWPPP ineffective under the General Permit and would require revisions to the SWPPP and submission to the SMARTS database. Similarly, missing or incomplete information would require additional research or analysis, revision of the SWPPP and the necessary submission to SMARTS. An incomplete or inconsistent SWPPP violates the General Permit and subsequently the CWA. General Permit §§ XXI.A; 33 U.S.C. § 1342.

15.    The "General Permit requires control of pollutant discharges using [Best Available Technology Economically Achievable ("BAT")] and [Best Conventional Pollutant Technology ("BCT")] to reduce and prevent discharges of pollutants, and any more stringent effluent limitations necessary for receiving waters to meet applicable water quality standards." General Permit § I.D. 32. "Dischargers shall implement BMPs that comply with BAT/BCT requirements of this General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice considering technological availability and economic practicability and achievability." General Permit § V.A.; *see also* 44 C.F.R. § 125.3(a)(2)(i)-(v) (Jan. 4, 1989) (NPDES Permits must include technology-based treatment requirements).

    The General Permit requires that:

    a.    All discharges of storm waters to waters of the United States are prohibited except as specifically authorized by the General Permit or another NPDES permit. One means by which to obtain exemption from the General Permit is to qualify for a "No Exposure Certification" ("NEC") authorized by the Regional Board under Section XVII.

    b.    Except for non-storm water discharges (NSWDs) authorized in Section IV,

discharges of liquids or materials other than storm water, either directly or indirectly to waters of the United States, are prohibited unless authorized by another NPDES permit. Unauthorized NSWDs must be either eliminated or authorized by a separate NPDES permit.

c. Industrial storm water discharges and authorized NSWDs that contain pollutants that cause or threaten to cause pollution, contamination, or nuisance as defined in section 13050 of the Water Code, are prohibited.

d. Discharges that violate any discharge prohibitions contained in applicable Regional Water Quality Control Board Plans (Basin Plans), or statewide water quality control plans and policies are prohibited.

16. Under the CWA, "any citizen may commence a civil action" "against any person... who is alleged to be in violation of (A) an effluent standard or limitations under [the CWA] or (b) an Order issued by... a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1). "No action may be commenced...prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator [of the EPA], (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A). By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

17. In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the district court's jurisdiction "to apply any appropriate civil penalties under section 1319(d)." 33 U.S.C. § 1365(a). Section 1319(d) declares that "[a]ny person who violates...any permit condition or limitation implementing any of such sections in a[n NPDES] permit... shall be subject to a civil penalty not to exceed $[54,833.00] per day for each violation." 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit § XXI.Q.1.

18. Violations of provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

## V. FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS

19. Defendants' Facility is a winemaking operation. RIVER WATCH is informed and believes, and upon such information and belief alleges, that the Facility falls under SIC Code 2084 - "Wines, Brandy, and Brandy Spirits".

20. RIVER WATCH is informed and believes, and on such information and belief alleges, that large quantities of process, waste, and wash water are discharged from the Facility site either directly or from the waste pond located adjacent to Crawford Creek, a tributary to the Russian River and a water of the United States.

21. RIVER WATCH is informed and believes, and on such information and belief alleges, that Defendants have failed and are failing to conduct industrial operations at the Facility with proper coverage under and in compliance with any of the requirements of the CWA including, but not limited to, eliminating the threat of pollution from those industrial operations.

    a. On February 9, 2016, Defendants submitted an NEC form to the RWQCB. RIVER WATCH, on information and belief, contends the Facility does not meet the requirements of the NEC. RIVER WATCH alleges there are conflicting facts on the NEC form signed by winemaker Antoine Favero, and on information on maps/diagrams available to RIVER WATCH on SMARTS provided by the Facility. The NEC form "Checklist" includes check-marks stating "Outdoor Storage Not Exposed," "Private Roads … Not Exposed," and "Processed Wastewater Not Exposed." But the "Monitoring Diagram," "Potential Pollutants Diagram," "Facility Diagram," and "Vicinity Diagram" for the Facility reveal outdoor storage, a retention pond with "Underground Conveyance Flow" from the Facility, and exposed private roads on-site (to provide access for the industrial operations, as well as the on-site beverage tasting facility, group tours, and overnight accommodations). RIVER WATCH alleges there are no publicly available documents demonstrating that the retention pond is sufficiently sized or constructed to prevent overflows or subsurface releases, or documents demonstrating that the roadways used for the trucking of supplies to, from, and

within the Facility, as well as traffic to and from the Tasting Room, are constructed and maintained to properly control storm water discharges. All of these activities take place in close proximity to Crawford Creek, a tributary to the nearby Russian River and a water of the United States.

b. On September 1, 2019, Defendants submitted an NOI to obtain coverage under the General Permit, and obtained NPDES coverage under the General Permit on or about December 1, 2019. The State Water Resources Control Board assigned Waste Discharge Identification ("WDID") number 1 23NEC001886 to the Facility. RIVER WATCH alleges Defendants have pivoted from asserting no obligation to comply with the General Permit (filing the NEC) to seeking coverage under its umbrella, moving from noncompliance with one set of General Permit provisions to violating the substantive and procedural requirements of the General Permit relating to storm water management control detailed in Paragraphs 9 -15 of this Complaint. The result is the discharge of industrial storm water to Crawford Creek, a tributary to the nearby Russian River and a water of the United States.

## VI. CLAIM FOR RELIEF

**Violations of the CWA Pursuant to CWA § 505(a)(1)(B), 33 U.S.C. § 1365(a)(1)(B) - Failure to Comply with CWA Requirements for Industrial Discharges and Violation of NPDES Permit No. CAS000001, Industrial Storm Water General Permit**

22. Each and every allegation set forth in this Complaint is incorporated herein by reference.

23. Each day since August 1, 2015, Defendants have failed and continue to fail to comply with the NPDES permitting requirements of the CWA, and in particular the General Permit, because Defendants have failed and continue to fail to:

   a. properly obtain coverage under the General Permit, either through compliance with the NEC or NOI application requirements; and,

   b. comply with the substantive storm water General Permit requirements detailed in Paragraphs 9-15 of this Complaint.

24.     Each day since August 1, 2015 on which unauthorized storm water discharges, NSWDs, liquids, or materials other than storm water are discharged from the Facility either directly or indirectly to waters of the United States, Defendants are violating the General Permit and thus the CWA.

25.     Each day since August 1, 2015 on which storm water discharges and/or NSWDs containing pollutants that cause or threaten to cause pollution, contamination, or nuisance as defined in section 13050 of the Water Code are discharged from the Facility, Defendants are violating the General Permit and thus the CWA.

26.     Each day since August 1, 2015 on which discharges from the Facility violate any discharge prohibitions contained in applicable RWQCB Plans (Basin Plans), or statewide water quality control plans and policies, Defendants are violating the General Permit and thus the CWA.

27.     Noncompliance with the General Permit constitutes a violation of the CWA. General Permit § XXI.A; 33 U.S.C. § 1342.

28.     Each violation is a separate violation of the CWA.

**VII.    RELIEF REQUESTED**

Wherefore, RIVER WATCH respectfully requests that the Court grant judgment providing the following relief:

29.     Declare Defendants to have violated and to be in violation of the CWA;

30.     Issue an injunction ordering Defendants to immediately operate the Facility in compliance with the NPDES permitting requirements in the CWA;

31.     Enjoin Defendants from discharging pollutants from the Facility and to the surface waters or ground waters surrounding the Facility until such time as Defendants have developed and implemented an adequate SWPPP;

32.     Order Defendants to pay civil penalties of $54,833.00 per day/per violation for each violation of the CWA pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1;

33.     Order Defendants to take appropriate actions to restore the quality of United States waters impaired by industrial activities taking place at the Facility;

34. Order Defendants to pay RIVER WATCH's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law; and

35. Award such other and further relief as may be just and proper.

DATED: January 9, 2020          LAW OFFICE OF JACK SILVER

By:     */s/ Jack Silver*
            Jack Silver

LAW OFFICE OF DAVID J. WEINSOFF

By:     */s/ David Weinsoff*
            David Weinsoff

Attorneys for Plaintiff
CALIFORNIA RIVER WATCH